# EXHIBIT C

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

TRUMP MEDIA & TECHNOLOGY
GROUP CORP,
        Plaintiff,

v.

GUARDIAN NEWS AND MEDIA
LTD,
PENSKE MEDIA CORPORATION,
CHRIS ANDERSON,
WILL WILKERSON,
        Defendant.

CASE NO.  2024 CA 003653 NC
        DIVISION C CIRCUIT

_____

**ORDER
(1) GRANTING IN PART AND DENYING IN PART
VARIOUS MOTIONS TO DISMISS;
(2) GRANTING PLAINTIFF LEAVE TO FILE AN AMENDED COMPLAINT;
AND (3) DISMISSING DEFENDANT CHRIS ANDERSON WITH PREJUDICE;**

This matter is before the Court following a hearing on the following motions:

- Defendant GUARDIAN NEWS & MEDIA LTD's ("the Guardian") Motion to Dismiss [DIN 95];

- Defendant WILL WILKERSON's ("Wilkerson") Motion to Dismiss the and for Attorneys' Fees or, in the Alternative, Motion for Summary Judgment [DIN 94];

- Defendant PENSKE MEDIA CORPORATION's ("Penske") Motion to Dismiss [DIN 96]; and

- Defendant CHRIS ANDERSON's ("Anderson") Motion to Dismiss and for Attorneys' Fees [DIN 97]

Plaintiff TRUMP MEDIA & TECHNOLOGY GROUP CORP. ("TMTG") filed written responses located at DINs 120, 121, and 122. The Court, having considered the motions, the responses, the matters presented at the hearing, and applicable law, finds as follows:

**The First Amended Complaint**

The First Amended Complaint purports to allege defamation and defamation per se against all four defendants in separate counts (Counts 1, 3, and 4), defamation by implication

against the Guardian and Wilkerson (Count 2), injurious falsehood against all four defendants (Counts 5-7), and civil conspiracy against the Guardian and Wilkerson (Count 8) [DIN 73].

This action arises from the publication of several articles reporting on a federal criminal investigation related to TMTG's receipt of two payments totaling $8 million. On March 15 and March 17, 2023, the Guardian published two articles stating federal prosecutors in New York were conducting a money laundering investigation related to the payments, which were wired through the Caribbean from Paxum Bank and ES Family Trust, entities with ties to an ally of Russian president Vladimir Putin and a history of providing banking services to the sex worker industry [DINs 74-75]. The articles report Wilkerson's statements that the origins of the loans caused alarm at TMTG and TMTG's then CFO weighed returning the money, but the money was ultimately not returned [DIN 74, p. 2; DIN 75, pp. 1-3].

The Guardian articles were reported on by others. On March 15 and March 22, Penske published two articles in *Variety* that reported federal prosecutors investigated TMTG for potential money laundering violations related to the payments [DINs 76-77]. On March 18, Anderson published an article in the *Sarasota Herald-Tribune* that stated federal prosecutors were reportedly investigating the payments to TMTG [DIN 78]. The *Variety* articles and the *Herald-Tribune* article explicitly reference and provide direct links to the Guardian articles as the source for the statements at issue [DIN 76, p. 1; DIN 77, pp. 4-5; DIN 78, pp. 1-3].

TMTG alleges the articles published by the Defendants are false and defamatory because TMTG "is not, and never was, under investigation for money laundering," and neither TMTG nor its executives have "been the focus of any investigation" [DIN 73, p. 11, ¶ 35].

The defendants move to dismiss the First Amended Complaint, and Wilkerson further moves in the alternative for summary judgment.

## Elements

A motion to dismiss tests the legal sufficiency of the complaint. Brock v. Bowein, 99 So. 3d 580, 585 (Fla. 2d DCA 2012). The Court accepts the Plaintiff's material allegations as true and draws all reasonable inferences therefrom in Plaintiff's favor. Murphy v. Bay Colony Prop. Owners Ass'n, 12 So. 3d 924, 926 (Fla. 2d DCA 2009); Gann v. BAC Home Loans Servicing, LP, 145 So. 3d 906, 908 (Fla. 2d DCA 2014).

A defamation claim brought by a public figure has five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." Kieffer v. Atheists of Florida, Inc., 269 So. 3d 656, 659 (Fla. 2d DCA 2019), *quoting* Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008).

A claim for defamation by implication requires that: (1) the statements are presented in a manner that reasonably implies false and defamatory facts; and (2) the statements affirmatively suggest the defendant intends or endorses the defamatory implication. Jews for Jesus, 997 So. 2d

at 1106-07 (citations omitted). This claim is "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." Id. at 1107.

A claim for injurious falsehood has five elements: "(1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood." Bothmann v. Harrington, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). Although injurious falsehood is distinct from defamation in its protection of economic interests instead of personal reputation, Florida courts nonetheless treat the torts identically. Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp., 831 So. 2d 204, 209 (Fla. 4th DCA 2002).

TMTG acknowledges it is a public figure [DIN 120, pp. 2-3]. See alsoTrump Media & Tech. Group Corp. v. WP Company LLC, 720 F. Supp. 3d 1203, 1211 (M.D. Fla. 2024) (finding TMTG is a public figure generally). As such, the claims for defamation, defamation by implication, and injurious falsehood must show actual malice. Actual malice requires that at the time of the publication, the defendant either knew the statement was false or acted with reckless disregard for its truth. Sullivan, 376 U.S. at 279-80; Rasmussen v. Collier County Pub. Co., 946 So. 2d 567, 570 (Fla. 2d DCA 2006); Dockery v. Florida Democratic Party, 799 So. 2d 291, 294 (Fla. 2d DCA 2001). Reckless disregard means the defendant in fact "entertained serious doubts as to the truth of the publication." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) (cleaned up); accordLam, 329 So. 3d at 197. Actual malice is a rigorous standard for pleading purposes. Greene v. Times Pub. Co., 130 So. 3d 724, 729 (Fla. 3d DCA 2014).

A claim for civil conspiracy has four elements: "(1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) the execution of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of said acts." Logan v. Morgan, Lewis & Bockius LLP, 350 So. 3d 404, 412 (Fla. 2d DCA 2022).

## Florida Anti-SLAPP Statute

The Guardian, Wilkerson, and Anderson move for dismissal under section 768.295, Florida Statutes (2023). Wilkerson moves in the alternative for summary judgment under the statute. Penske explicitly does not invoke the statute for its motion to dismiss.

The Florida Legislature, as a matter of public policy, prohibits what it calls "Strategic Lawsuits Against Public Participation," or "SLAPP." § 768.295, Fla. Stat. The statute explains state policy in relevant part as follows:

> It is the intent of the Legislature to protect the right in Florida to exercise the rights of free speech in connection with public issues . . . as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution. It is the public policy of this state that a person

> or governmental entity not engage in SLAPP suits because such actions
> are inconsistent with the right of persons to exercise such constitutional
> rights of free speech in connection with public issues. Therefore, the
> Legislature finds and declares that prohibiting such lawsuits as herein
> described will preserve this fundamental state policy [and] preserve the
> constitutional rights of persons in Florida . . . . It is the intent of the
> Legislature that such lawsuits be expeditiously disposed of by the courts.

§ 768.295(1), Fla. Stat.

In addition to stating public policy, the Legislature specifically prohibited SLAPP suits:

> A person or governmental entity in this state may not file or cause to be
> filed, through its employees or agents, any lawsuit, cause of action, claim,
> cross-claim, or counterclaim against another person or entity without merit
> and primarily because such person or entity has exercised the
> constitutional right of free speech in connection with a public issue, or
> right to peacefully assemble, to instruct representatives of government, or
> to petition for redress of grievances before the various governmental
> entities of this state, as protected by the First Amendment to the United
> States Constitution and s. 5, Art. I of the State Constitution.

§ 768.295(3), Fla. Stat.

"Free speech in connection with public issues" is defined by the Legislature to mean "any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." § 768.295(2)(a), Fla. Stat. The statements at issue were made in connection with magazine articles and news reports. Thus, they fall under the reach of the statute.

A party claiming a violation of the statute may file a motion to dismiss or motion for summary judgment, and a court must bring "expeditious resolution" of a claimed SLAPP suit "at the earliest possible time" with specific procedures identified in the statute. § 768.295(4), Fla. Stat. Of the motions before the Court, only Wilkerson moves for summary judgment in the alternative to his motion to dismiss. The Court will (attempt to) be clear as to its analysis under the distinct frameworks. See McQueen v. Baskin, 2023 WL 7929535, *4 (Fla. 2d DCA Nov. 17, 2023) (identifying concern of a "unitary motion that asserted both rules without delineating which arguments were for dismissal and which were for summary judgment).

In Gundel v. AV Homes, Inc., 264 So. 3d 304 (Fla. 2019), the Second District explained the statutory procedure places the "initial burden on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies" and, once done, the burden shifts "to the claimant to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit[.]'" Gundel, 264 So. 3d at 314. As Gundel made clear,

and reiterated in <u>Baird v. Mason Classical Academy, Inc.</u>, 317 So. 3d 264, 268 (Fla. 2d DCA 2021); and <u>Davis v. Mishiyev</u>, 339 So. 3d 449, 452-453 (Fla. 2d DCA 2022), the trial court must apply the statutory test to motion to dismiss, not the "normal" motion to dismiss four-corners' standard. In fact, the trial court errs if it applies the traditional four-corners review to determine if the complaint states a cause of action. <u>Gundel</u>, 264 So. 3d at 314; <u>Baird</u>, 371 So. 3d at 268; and <u>Davis</u>, 339 So. 3d at 453.

TMTG argues the discussion of burden-shifting in <u>Gundel</u> is dicta and incorrect, as reflected in subsequent decisions of other courts [DIN 120, pp. 4-6]. The Court understands the Third District disagrees with the burden shifting approach adopted in <u>Gundel</u>. <u>Lam v. Univision Communications, Inc.</u>, 329 So. 3d 2021 (Fla. 3d DCA 2021) (certified conflict with <u>Gundel</u> on appropriateness of heightened burden). The Court also understands the Florida Supreme Court has disapproved of <u>Gundel</u>'s ruling that denial of an anti-SLAPP motion to dismiss results in irreparable harm for certiorari purposes. <u>Vericker v. Powell</u>, 406 So. 3d 939, 945-46 (Fla. 2025) (disapproving <u>Davis</u>, <u>Baird</u>, and <u>Gundel</u> on the question of irreparable harm). But <u>Vericker</u> did not address or disturb <u>Gundel</u> as to the burden shifting procedure under section 768.295, and the Court declines TMTG's invitation to dispense with <u>Gundel</u>'s discussion of that issue as dicta. The Court is within the Second District's territorial boundary, and the Court will apply the Second District's precedent. <u>Pardo v. State</u>, 596 So. 2d 665, 666-667 (Fla. 1992) (where there is interdistrict conflict, trial court must apply its district court's holding).

**1.**
**The Guardian and Wilkerson**

The Court first addresses the Guardian and Wilkerson's motions to dismiss, then turns to Wilkerson's alternative motion for summary judgment.

*A. <u>Defamation (Counts 1-2)</u>*

Count 1 purports to state a claim for defamation and defamation per se based on seven allegedly false statements published in the Guardian articles:

1. "Federal investigators examined [TMTG] for possible money laundering";

2. "New York prosecutors expanded [a] criminal inquiry of [TMTG] last year and examined acceptance of $8m with suspected Russian ties";

3. "Federal prosecutors in New York involved in the criminal investigation into [TMTG] last year started examining whether it violated money laundering statutes in connection with the acceptance of $8m with suspected Russian ties";

4. "[TMTG] initially came under criminal investigation over its preparations for a potential merger with a blank check company called Digital World (DWAC)";

5. That there was a "criminal investigation" of TMTG and that the nature of the investigation "expanded";

6.    That "prosecutors in the US attorney's office for the southern district of New York" were "examin[ing]" the "Russian connection"; and

7.    That "months after [TMTG] came under criminal investigation for the merger by the US attorney's office for the southern district of New York, federal prosecutors started to examine whether the company violated money-laundering statutes over the payments."

[DIN 73, pp. 10-11, ¶ 34].

Count 2 purports to state a claim for defamation by implication based on two statements published in the Guardian articles:

1.    "The extent of the exposure for Trump Media and its officers for money laundering remains unclear. The statutes broadly require prosecutors to show that defendants knew the money was the proceeds of some form of unlawful activity and the transaction was designed to conceal its source. But money laundering prosecutions … can be based on materials that show that the money in question was unlikely to have legitimate origins"; and

2.    "A spokesman for the justice department, the US attorney's office for the southern district of New York and outside counsel for Trump Media declined to comment about the investigation."

[DIN 73, pp. 14-15, ¶ 47].

The Guardian and Wilkerson first argue the challenged statements are substantially true. The substantial truth doctrine provides that even if the challenged statement contains minor inaccuracies, it is not actionable if the "gist" or "sting" of the statement is true when read in the full context of its publication. Kieffer, 269 So. 3d at 659. The ultimate question is whether the alleged inaccuracies change the statement's effect on the mind of the reader. Readon v. WPLG, LLC, 317 So. 3d 12229, 1235 (Fla. 3d DCA 2021). Where a statement is ambiguous and reasonably susceptible of a defamatory meaning, the question must be submitted to the trier of fact. Kieffer, 269 So. 3d at 659; Pep Boys v. New World Communications of Tampa, Inc., 711 So. 2d 1325, 1328 (Fla. 2d DCA 1998).

The Guardian and Wilkerson argue the gist of the articles is that the loans to TMTG from Russian sources caused concern among TMTG executives and prompted an investigation by federal prosecutors [DIN 95, pp. 9-10]. They argue that any inaccuracies in the challenged statements do not materially change their sting within the context of the articles. TMTG responds that the false and defamatory gist of the articles is that prosecutors were investigating TMTG specifically or focusing on TMTG for wrongdoing [DIN 120, pp. 7-8]. The Court finds the challenged statements are susceptible of both interpretations and cannot be resolved on a motion to dismiss.

The Guardian and Wilkerson next argue Counts 1 and 2 fail to allege actual malice. The Court agrees. The actual malice element of both claims rests on the following allegations:

- The Guardian harbors bias against TMTG and frequently publishes articles critical of Donald Trump.

- The Guardian relied on Wilkerson as its sole source for the statements despite knowing Wilkerson had "bad blood with TMTG" because he was fired from TMTG for making unauthorized disclosures.

- The Guardian failed to investigate and obtain independent evidence for the statements in violation of journalistic standards.

- Devin Nunes, then CEO of TMTG, notified the Guardian the statements were false.

- Wilkerson "knew that TMTG did not commit any wrongdoing" because he was aware of TMTG's finances from his former role.

- Wilkerson "was in a position to know" the statements were false based on his discussions with federal investigators.

[DIN 73, pp. 11-13, ¶¶ 40-41].

TMTG's allegations of Guardian and Wilkerson's bias or ill will, without more, does not show actual malice. Don King Productions, Inc. v. Walt Disney Co., 40 So. 3d 40, 44 (Fla. 4th DCA 2010); Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) (applying Florida law).

TMTG's allegations that Wilkerson was the sole source for the challenged statements is belied by the face of the article. The article attributes its description of the investigation to the plural "sources familiar with the matter" [DIN 74, p. 1]. The only statements attributed to Wilkerson are: (1) that DWAC CEO Patrick Orlando declined to provide details about the lenders or the origins of the loan; and (2) that concerns about the origins of the loans prompted TMTG's then CFO to consider returning the money [DIN 74, p. 2]. TMTG does not allege these statements are defamatory. TMTG concedes Wilkerson had knowledge of relevant TMTG financial information and was in discussions with the federal investigators referenced in the articles [DIN 73, p. 13, ¶ 41]. SeeDockery, 799 So. 2d at 296 ("Reliance upon a reliable source insulates a defendant from a finding of actual malice as a matter of law.") (internal citations omitted). Whether Wilkerson knew TMTG had actually committed any wrongdoing is not germane to the existence or nature of the investigation.

Actual malice also requires more than a departure from journalistic standards or a mere failure to investigate. Readon, 317 So. 3d at 1235 (quoting Michel v. NYP Holdings, Inc., 816 F.3d 686, 701-02 (11th Cir. 2016)). Moreover, the article reflects it was based on multiple sources familiar with the investigation, review of internal TMTG communications, investigation

of the entities who made the loans, and fruitless requests for further information from the Department of Justice, the investigators' office, and outside counsel for TMTG.

The article also reported the denial of then CEO Nunes that TMTG knew of any issues related to the loans. This denial is not germane to the existence or nature of the investigation, and even if it was, such commonplace denials do not establish actual malice. Trump Media & Tech. Group Corp. v. WP Company LLC, 720 F. Supp. 3d 1203, 1211 (M.D. Fla. 2024); Connaughton, 491 U.S. at 691 n.37.

Finally, TMTG's allegations that further investigation would have proved the statements false or that Wilkerson was "in a position to know" the statements were false are conclusory and unsupported by factual allegations.

Counts 1 and 2 are dismissed for failure to state a cause of action. Where a claim is dismissed on this basis under section 768.295, the plaintiff should be afforded leave to amend. Crosby v. Town of Indian River Shores, 358 So. 3d 444, 447 (Fla. 4th DCA 2023); Lam, 329 So. 3d at 198-99.

### B. *Injurious Falsehood (Count 5)*

Count 5 purports to state a claim for injurious falsehood based on the false assertion "that TMTG is under criminal investigation for money laundering" [DIN 73, p. 20, ¶ 78]. The Guardian and Wilkerson move to dismiss this claim, first arguing the claim is barred by the single action rule.

Florida's single action rule operates to bar additional tort claims premised on the same publication on which a defamation claim is based. Fridovich v. Fridovich, 598 So. 2d 65, 69-70 (Fla. 1992); Ovadia v. Bloom, 756 So. 2d 137, 140-41 (Fla. 3d DCA 2000); Orlando Sports Stadium, Inc. v. Sentinel Star Co., 316 So. 2d 607, 609 (Fla. 4th DCA 1975). TMTG argues the single action rule does not bar its non-defamation claims because the rule applies only where a defamation claim has failed. The Court acknowledges a split of authority on this question among federal courts applying Florida's single action rule. Emergency Recovery, Inc. v. Gov't Employees Ins. Co., 773 F. Supp. 3d 1304, 1314 n.4 (M.D. Fla. 2025) (collecting cases). The federal district courts are not bound by the decisions of Florida's district courts of appeal and instead may "choose the rule" they believe the Florida Supreme Court "is likely in the future to adopt." Id. at 1315 (citing Putnam v. Erie City Mfg. Co., 338 F.2d 911, 917 (5th Cir. 1964)).

This Court, however, *is* bound by the decisions of the Florida district courts of appeal in the absence of interdistrict conflict. Pardo, 596 So. 2d at 666. In International Security Management Group, Inc. v. Rolland, 271 So. 3d 33 (Fla. 3d DCA 2018), the district court applied the single action rule to bar a negligence claim while remanding the related defamation claim for a new trial. Id. at 47-49. TMTG does not cite, and the Court has not found, any contrary decisions from the Second District or any other district courts of appeal rejecting application of the single action rule because the defamation claim remains pending. The dispute among the federal courts "has not played a dispositive role" in any decisions of the Florida district courts of appeal, with the "sole exception" of Rolland. Emergency Recovery, 773 F.

Supp. 3d at 1317. The Court is therefore bound to follow the holding in Rolland that the single action rule bars additional claims even if the defamation claim has not failed.

TMTG separately argues the single action rule is inapplicable because a claim for injurious falsehood protects economic interests distinct from the reputational interests protected by the defamation claim. Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp., 831 So. 2d 204, 209 (Fla. 4th DCA 2002) (citing Restatement (Second) of Torts § 623A (1977)). While this is true, Callaway acknowledges that Florida courts afford "identical treatment" to the claims. Id. Further, the single action rule is premised in part on treating the various items of damage arising from the same defamatory publication within a single claim. Id. at 208.

Because Count 5 is predicated on the same publication as the defamation claims in Counts 1 and 2, it is barred by the single action rule.

Count 5 is dismissed with prejudice.

### C. *Conspiracy to Defame (Count 8)*

Count 8 purports to state a claim for civil conspiracy based on a joint scheme by the Guardian and Wilkerson to publish the allegedly defamatory statements [DIN 73, p. 23, ¶ 96]. As with Count 5, Count 8 is predicated on the same publication as the defamation claims in Counts 1 and 2 and is therefore barred by the single action rule.

Count 8 is dismissed with prejudice.

### D. *Wilkerson's Alternative Motion for Summary Judgment*

TMTG moves to extend the deadline for responding to Wilkerson's alternative motion for summary judgment, arguing that initial discovery, including a deposition of Wilkerson, is necessary for a sufficient response [DIN 122, p. 1 n.1; DIN 101; DIN 116]. "[B]efore being subjected to summary judgment because of the absence of evidence, the nonmovant must have been afforded adequate time for discovery." Coury v. City of Tampa, 397 So. 3d 805, 811 (Fla. 2d DCA 2024) (cleaned up). A summary judgment hearing may be continued upon showing by affidavit that relevant evidence is available and that any failure to obtain this evidence is not attributable to the moving party. Valer v. Citizens Prop. Ins. Corp., 404 So. 3d 570, 576 (Fla. 3d DCA 2025). TMTG has submitted a declaration that the requested discovery will refute the facts and evidence submitted by Wilkerson [DIN 117].

The Court grants TMTG's request for additional time to respond to Wilkerson's alternative motion for summary judgment. The Court shall address the summary judgment motion after the requested initial discovery is completed.

**2.**
**Penske**

### A. *Defamation (Count 3)*

Count 3 purports to state a claim for defamation and defamation per se for Penske's publication of the false statement that federal investigators "probed" TMTG "for potential violations of money laundering laws" [DIN 73, p. 16, ¶ 58]. This statement appears exclusively in the March 15 *Variety* article and is based on the March 15 Guardian article [DIN 73, Ex. C, p. 1]. In its written response, TMTG suggests Count 3 is also premised on the statement in the March 22 *Variety* article that "the Guardian reported that federal prosecutors had investigated $8 million in payments to Trump Media, loans that allegedly had been arranged by Orlando for potential money-laundering violations" [DIN 121, pp. 4-5]. But the First Amended Complaint contains no reference to this statement, in Count 3 or otherwise.

As to the single statement identified in Count 3, Penske moves to dismiss the claim based on the neutral reporting privilege and the wire service privilege. TMTG correctly argues no Florida appellate court has recognized this privilege. Rendón v. Bloomberg L.P., No. 19-14046, 2025 WL 1482420, at *5 (11th Cir. May 23, 2025).

Florida law does, however, recognize the wire service privilege. The wire service privilege protects a defendant who republishes the reporting of a reputable news agency. Layne v. Tribune Co., 108 Fla. 177, 186 (Fla. 1933). In a separate defamation action related to republication of articles concerning TMTG that appeared in *The Guardian*, Judge Barber, writing for the Middle District, observed *The Guardian* is generally considered a "well respected" newspaper. Trump Media, 720 F. Supp. 3d at 1212-13. To overcome the wire service privilege, TMTG must show Defendants "acted in a negligent, reckless, or careless manner" in republishing the Guardian article. Layne, 108 Fla. at 186. The wire service privilege is a defense to the malice element of a defamation claim. Id. at 188. As a public figure, TMTG must allege facts showing Penske had, or should have had, substantial reasons to question the accuracy of the Guardian article. Nix v. ESPN, Inc., 772 Fed. Appx. 807, 813 (11th Cir. 2019).

TMTG argues it has sufficiently alleged Penske's republication of the Guardian article was at least negligent in its republication for the reasons discussed in Counts 1 and 2: the Guardian's animus towards Donald Trump, Penske's knowledge that Wilkerson had been terminated by TMTG, and Penske's failure to conduct its own investigation [DIN 121, pp. 6-7]. For the reasons discussed in Counts 1 and 2 above, TMTG's allegations fail to establish substantial grounds to question the reporting in the March 15 Guardian article.

TMTG also argues that the wire service privilege is inapplicable because Penske did not merely republish the Guardian article but also "embraced [the] article as its own" and inserted its own opinions and assertions [DIN 121, pp. 7-8]. The statement challenged in Count 3 ends with "the Guardian reported" and provides a link to the March 15 Guardian article; no other statements in the March 15 *Variety* article adopt or embrace the Guardian's reporting as Penske's own [DINs 77-78]. The other opinions and assertions cited by TMTG do not concern the federal money laundering investigation at issue in Count 3.

Count 3 is dismissed for failing to state a cause of action. TMTG shall be afforded leave to amend.

B. *Injurious Falsehood (Count 6)*

Count 6 purports to state a claim against Penske for injurious falsehood. For the reasons discussed in Count 5, this claim is dismissed with leave to amend. TMTG must state a distinct claim based on a separate publication from that alleged in Count 3.

**3.**
**Anderson**

A. *Defamation (Count 4)*

Count 4 purports to state a claim against Anderson for defamation and defamation per se for writing "that TMTG was under federal investigation, including a link to the Guardian Articles so that viewers would know the investigation was for money laundering" [DIN 73, p. 18, ¶ 68].

Where a publication consists of "[c]ommentary or opinion based on facts that are set forth in the article or which are otherwise known or available to the reader," it is not actionable as defamation. Rasmussen, 946 So. 2d at 571. Whether a publication is protected opinion is a pure question of law. McQueen v. Baskin, 377 So. 3d 170, 177 (Fla. 2d DCA 2023); From v. Tallahassee Democrat, Inc., 400 So. 2d 52, 57 (Fla. 1st DCA 1981). This determination is not based on isolated examination of particular words or phrases but on the publication in its entirety, including cautionary terms used and the circumstances surrounding the publication. Rasmussen, 946 So. 2d at 571.

TMTG argues the Anderson article is not protected opinion because the statement that TMTG was under federal investigation—for money laundering or otherwise—was objectively verifiable. Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-22 (1990) (distinguishing subjective assertions from objectively verifiable statements of fact). TMTG argues Anderson "unequivocally endorsed the lie that TMTG was under federal investigation" [DIN 120, p. 22].

The Anderson article was published in the opinion section of the *Herald-Tribune* with a disclaimer that it expressed the views of its author, and the headline identified the article as an opinion piece. When viewed on the *Herald-Tribune* website, the article also includes the following phrase: "Is Trump's Sarasota company tied to Russia? Investigators want to know". The article begins by stating federal prosecutors "have reportedly been investigating two loans" made to TMTG, a statement that is explicitly attributed to the March 15 Guardian article. The Anderson article states "[t]he Guardian reported this week" that the prosecutors "were examining loans" made to TMTG. The article opines that "even if the latest allegations are unfounded, the optics of being investigated for money laundering will not enhance his 2024 presidential run."

The Anderson article, when read in its entirety, is protected opinion and not actionable. It is consistently identified as opinion article. It explicitly sets forth the "reported" facts on which the opinions are based, and it acknowledges that the "allegations" reported by the Guardian may be "unfounded." Anderson states that prosecutors were "reportedly" investigating "the loans" made to TMTG, a statement TMTG does not dispute. The sole reference to TMTG being "under

investigation" is Anderson's opinion on how the "optics" of the facts reported by the Guardian may affect then-candidate Trump's presidential campaign, with cautionary language that the allegations may be unfounded. When placed in context, these statements do not endorse the Guardian's reporting but merely offer opinion and commentary on the possible effects of that reporting, with the caveat that it may be unfounded.

Count 4 is dismissed with prejudice.

*B. Injurious Falsehood (Count 7)*

Count 7 purports to state a claim against Anderson for injurious falsehood based on the same statements raised in Count 4. For the reasons discussed above, Count 7 is dismissed with prejudice under the single action rule.

Having determined TMTG's claims against Anderson are based primarily on protected speech and are without merit, Anderson is entitled to reasonable attorney fees pursuant to section 768.295(4).

IT IS THEREFORE ORDERED AND ADJUDGED:

1.   Defendant Guardian's Anti-SLAPP Motion to dismiss First Amended Complaint [DIN 95] is granted in part and denied in part. Counts 5 and 8 of the First Amended Complaint are dismissed with prejudice as to Defendant Guardian. Counts 1 and 2 of the First Amended Complaint are dismissed with leave to amend as to Defendant Guardian.

2.   Defendant Wilkerson's Motion to Dismiss Amended Complaint and for Attorneys' Fees or, in the Alternative, Motion for Summary Judgment [DIN 94] is granted in part and denied in part. Counts 5 and 8 of the First Amended Complaint are dismissed with prejudice as to Defendant Wilkerson. Counts 1 and 2 of the First Amended Complaint are dismissed with leave to amend as to Defendant Wilkerson. The Court reserves ruling on Wilkerson's alternative motion pending completion of initial discovery as set forth in this order.

3.   Defendant Penske's Motion to Dismiss [DIN 96] is granted in part and denied in part. Count 6 of the First Amended Complaint is dismissed with prejudice. Count 3 of the First Amended Complaint is dismissed with leave to amend.

4.   Defendant Anderson's Motion to Dismiss and for Attorneys' Fees [DIN 97] is granted. Counts 4 and 7 are dismissed with prejudice.

5.   Plaintiff Trump Media & Technology Group, Inc. shall take nothing by its action against Defendant CHRIS ANDERSON. Defendant CHRIS ANDERSON shall go hence without day. The Court reserves jurisdiction to aware attorney fees or costs or both, if any, upon a timely motion.

6. TMTG may file a second amended complaint as to Counts 1-3 on or before January 2, 2026. Should TMTG fail to do so, the remaining Defendants may move the Court for entry of a with prejudice dismissal.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on November 24, 2025.

e-Signed 11/24/2025 3:11 PM 2024 CA 003653 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On November 24, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

RACHEL ELISE FUGATE
100 SOUTH ASHLEY DR
SUITE 600
TAMPA, FL 33602

JAMES BURGES LAKE
THOMAS & LOCICERO PL
400 NORTH ASHLEY DRIVE STE 1100
TAMPA, FL 33602

STEPHEN B FRENCH
717 KING STREET
SUITE 200
ALEXANDRIA, VA 22314

SARAH M PAPADELIAS
100 SOUTH ASHLEY DRIVE
SUITE 600
TAMPA, FL 33602

JARED J ROBERTS
717 KING ST STE 200

ALEXANDRIA, VA  22314

DEEDEE ROUSE GASCH
PO BOX 1950
WILMINGTON, NC  28402

MINCH MINCHIN
100 SOUTH ASHLEY DR
SUITE 600
TAMPA, FL  33602

LYNN OBERLANDER
BALLARD SPAHR LLP
1675 BROADWAY, 19TH FLOOR
NEW YORK, NY  10019

PATRICK M MINCEY
2001 K STREET NW, SUITE 250 NORTH TOWER
WASHINGTON, DC  20006

CHARLES D TOBIN
1909 K STREET, NW
12TH FLOOR
WASHINGTON, DC  20006

PATRICK M MINCEY
2001 K STREET NW, SUITE 250 NORTH TOWER
WASHINGTON, DC  20006

JESSICA BERGER
1511 NORTH WESTSHORE BLVD. SUITE 400
TAMPA, FL  33607

PHILIP S BREWSTER
560 GREEN BAY ROAD, SUITE 402
WINNETKA, IL  60093

STEPHEN J BELL
5535 CURRITUCK DRIVE, SUITE 210
WILMINGTON, NC  28403


FUGATE, RACHEL ELISE          aallbright@shullmanfugate.com
BELL, STEPHEN J                acamden@cshlaw.com
BELL, STEPHEN J                bell@minceybellmilnor.com

| | |
|---|---|
| GASCH, DEEDEE ROUSE | dgasch@cshlaw.com |
| LAKE, JAMES BURGES | jlake@tlolawfirm.com |
| FUGATE, RACHEL ELISE | lyoung@shullmanfugate.com |
| MINCEY, PATRICK M | mincey@minceybellmilnor.com |
| FUGATE, RACHEL ELISE | MMINCHIN@SHULLMANFUGATE.COM |
| BREWSTER, PHILIP S | philip.brewster@brewsteradvisory.com |
| FUGATE, RACHEL ELISE | pleadings@shullmanfugate.com |
| FUGATE, RACHEL ELISE | rfugate@shullmanfugate.com |
| FRENCH, STEPHEN B | shawnay@binnall.com |
| FRENCH, STEPHEN B | stephen@binnall.com |
| BELL, STEPHEN J | tirish@cshlaw.com |
| TOBIN, CHARLES D | tobinc@ballardspahr.com |
| Charles D Tobin | mendezc@ballardspahr.com |
| Charles D Tobin | litdocket_east@ballardspahr.com |
| Deedee Rouse Gasch | kbrown@cshlaw.com |
| James B Lake | bbrennan@tlolawfirm.com |
| James B Lake | nstfort@tlolawfirm.com |
| Jared Joseph Roberts | jared@binnall.com |
| Lynn Oberlander | oberlanderl@ballardspahr.com |
| Patrick M. Mincey | abolick@cshlaw.com |
| Yelan Escalona | yescalona@shullmanfugate.com |
| Yelan Escalona | acruz@shullmanfugate.com |